[Cite as *State v. Belton*, 2023-Ohio-294.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

State of Ohio                               Court of Appeals No.  L-20-1121

         Appellee                      Trial Court No.  CR0200802934

v.

Anthony Belton                         **DECISION AND JUDGMENT**

         Appellant                    Decided: January 30, 2023

* * * * *

Julia R. Bates, Lucas County Prosecuting Attorney, and
Evy M. Jarrett, Assistant Prosecuting Attorney, for appellee.

Timothy Young, Ohio State Public Defender, Allison Swain,
Randall L. Porter, and Samantha Koravecic, Assistant
State Public Defenders, for appellant.

* * * * *

**DUHART, P.J.**

{¶ 1} This case is before the court on appeal by appellant, Anthony Belton, from

the June 29, 2020 judgment of the Lucas County Common Pleas Court.  For the reasons

that follow, we affirm.

**Background**

{¶ 2} On the morning of August 13, 2008, a BP gas station at the corner of Dorr Street and Secor Road in Toledo, Lucas County, Ohio was robbed and the clerk, Matthew Dugan, was shot and killed.

{¶ 3} On August 25, 2008, appellant was charged by way of indictment with one count of aggravated murder pursuant to R.C. 2903.01(B) and (F), one count of aggravated robbery in violation of R.C. 2911.01(A)(1), a felony of the first degree, and one count of aggravated robbery, in violation of R.C. 2911.01(A)(3), also a felony of the first degree. All three counts had firearm specifications attached pursuant to R.C. 2941.145 and the aggravated murder count included two death penalty specifications pursuant to R.C. 2929.04(A)(3) (murder to escape detection) and R.C. 2929.04(A)(7) (felony murder).

{¶ 4} Appellant waived his right to a jury trial and entered pleas of no contest to each of the charges and specifications, and on April 2, 2012, the case proceeded to a hearing before a three-judge panel pursuant to R.C. 2945.06 and Crim.R. 11(C)(3).

**Trial and Mitigation Hearing**

{¶ 5} After the presentation of the state's case in chief, the three-judge panel unanimously found appellant guilty of all of the charges and the specifications. The state represented to the court that the two death penalty specifications merged and the state elected to proceed on the felony murder specification in R.C. 2929.04(A)(7).

2.

**{¶ 6}** A mitigation hearing was then held. Mark Rooks, a mitigation specialist; Kim Harold, appellant's mother; Linda Berry, appellant's great-aunt; Matthew Martin, a forensic counselor at the Lucas County Correction Center; and Dr. Robert Stinson, a forensic psychologist testified on behalf of appellant. Appellant also introduced 22 exhibits, including Kim's medical records, appellant's educational, employment, and Connecting Point records, as well as reports from interviews with appellant; Kim; appellant's aunt, Charise Harold; his grandmother, Sheila Googins; his aunt, Francine Belton; his cousin, Isaiah Everett; his brother, Aaron; and his father, Anthony Belton, Sr. David Connell, a clinical psychologist, testified for the state.

## Mitigation Evidence

**{¶ 7}** In *State v. Belton*, 149 Ohio St.3d 165, 74 N.E.3d 319, 2016-Ohio-1581, ¶ 161 - 186, the Ohio Supreme Court described the evidence presented in mitigation as follows:

i. Background and family history

[Kim Harold, appellant's mother,] was born to a teenage mother, Sheila Googins, in 1965. As a child, Kim moved frequently, living at times with her mother, her grandmother, and foster parents. When she was five or six, Kim moved in with her mother and stepfather, George Harold, who adopted her. George molested Kim for years, and at some point when Kim was a teenager, she told Sheila that George had molested her. Sheila told Kim she did not believe her, but then Sheila became depressed over the

allegation and attempted suicide. Kim moved in with her grandmother after Sheila's suicide attempt. Kim became depressed and began to use marijuana and crack, but she did complete high school and then attended a semester of a nursing program at the University of Toledo.

At a young age, Kim entered an 11-year relationship with Anthony Belton Sr. They had two sons together when Kim was in her early twenties. [Appellant] was born on November 23, 1985, and Aaron followed on January 5, 1987. Kim used drugs during both pregnancies-marijuana during the first and cocaine during the second. She was also hospitalized for an abdominal contusion during her pregnancy with [appellant]. Even so, records and family members indicate that [appellant]'s birth was normal and that he was a full-term baby.

As a young child, [appellant] saw his father infrequently. The family lived in Toledo, but Belton Sr. was stationed in Japan for four or five years as a member of the United States Marine Corps. When [appellant] was about four years old, Belton Sr. became frustrated with Kim's continued drug use, and he moved to California. Kim attempted suicide. But soon she began dating Belton Sr.'s nephew, Christopher Belton [Sr.], and they had a son [(Chris)] together. Christopher Sr. became like a surrogate father to [appellant].

4.

Kim and her sons moved frequently, living in eight or nine homes while [appellant] was growing up. [Appellant] attended school regularly, but he began to get into trouble at an early age. According to [appellant]'s great-aunt, [appellant] knew the difference between right and wrong, but had a tendency not to listen. Kim disciplined him by spanking him or hitting him with a belt.

[Appellant] witnessed both domestic abuse and drug use in the home. On one occasion, police came to investigate a domestic-violence incident and [appellant] was maced by the police. Another time, Kim went to the hospital, where she reported that Christopher [Sr.] had assaulted and raped her. Kim smoked marijuana in front of her sons, at times used $100 worth of cocaine in a single day, and left home for days-long crack binges. Yet she rejected offers from Belton Sr. and her mother to take the boys.

When [appellant] was around 11 years old, Kim was incarcerated for forgery and petty theft. Kim sent [appellant] and Aaron to live with [their father,] Belton Sr. in California. Initially, [appellant] attended school and earned good grades. He got along well with his father's girlfriend, LaTisha. But after about a year, Belton Sr. and LaTisha broke up, and the family moved.

When [appellant] was 13 or 14 years old, Belton Sr. began dating a woman named Michelle. Michelle and her three daughters moved into the

house, and she expected [appellant] to help with the kids. She also tried to act as a surrogate mother to [appellant], which he resented. According to Dr. Stinson, "By this time, [appellant] was an angry child who very much resented the abandonments that he had suffered up to this point in life."

Belton Sr. employed military-style discipline with the boys and frequently grounded [appellant] or took away privileges. He ordered [appellant] to do physical exercises such as push-ups as punishment. Belton Sr. also sometimes ordered [appellant] to box with him so that Belton Sr. could show him that he was stronger and was in charge. At times, he made [appellant] sit in a hot car all day while he worked.

[Appellant] attended Gompers High School in San Diego, California, a school that Stinson testified was known for its "crime ridden, gang infested environment." Riots broke out at Gompers several times a year, and when fights broke out, teachers would contain the fighting by closing gates inside the school until a swat team arrived. [Appellant]'s attendance at school was spotty. He got into fights, was beaten up a few times, and ultimately joined a gang. [Appellant] began using alcohol and marijuana, but he did not try cocaine or crack, because he had seen what those drugs did to his family members.

When [appellant] was 17 or 18 years old, he assaulted a female classmate, and her family threatened charges. Belton Sr. decided to send his sons back to Toledo on a bus.

Although [appellant] was glad to return to Toledo, he did not adjust well to the move; his great-aunt[, Linda Berry,] testified that he seemed depressed and angry. Initially, [appellant] enrolled in high school and got a job. But his school attendance was poor, and he was soon kicked out for fighting. [Appellant] began pursuing a GED, but he stopped attending classes. And he was fired from his job because he did not want to follow rules. Around this time, [appellant] began hanging out with his cousins, who used and dealt drugs.

[Appellant] lived with his mother and his great-aunt Sherry, but he left after he got into some disagreements with his great-aunt. Finally, [appellant] moved into the home of his maternal great-grandmother, Marian Do[t]son. Do[t]son ran a "flop house" for anyone who needed a place to stay. Do[t]son's guests tended to spend their days smoking marijuana, instead of working or attending school.

[Appellant]'s mother described him as intelligent, fun-loving, and not a bad person. She said that [appellant] loves to help people. And [appellant]'s great-aunt stated that she has never seen [appellant] get violent.

## ii. [Appellant]'s mental health

[Linda Berry, appellant's great-aunt], is a psychiatric nurse. She saw [appellant] frequently as a child and remembers him as being quiet. At family events, he sat alone rather than playing with other children.

According to Berry, [appellant] became severely depressed in 2003 when his uncle, George Harold, died in a motorcycle accident. George had been a father figure and a stabilizing force to [appellant]. After George's death, Berry said, [appellant] "wouldn't talk to anybody" and "isolated himself." Berry thinks [appellant] may have experienced hallucinations and shown other signs of psychosis at the time.

Berry set up an appointment for [appellant] to be evaluated at Connecting Point in November 2005. He was diagnosed with dysthymic disorder, which is chronic, low-grade depression. His file was closed in March 2006.

Dr. Bob Stinson * * * testified that he had met with [appellant], administered the Woodcock-Johnson III achievement test, and interviewed [appellant]'s mother, brother, cousin, and great-aunt. Stinson also reviewed discovery materials, the mitigation specialist's interview notes, and records collected by the mitigation specialist.

Stinson analyzed [appellant]'s life through the lens of a United States Department of Justice ("DOJ") model that identifies various risk

factors that make a person more likely to engage in criminal behavior, as well as various protective factors that reduce the risk of such behavior. According to Stinson, virtually every risk factor identified by the DOJ model applies to [appellant], meaning that he was "at high risk for developing a psychological disorder or drug dependence and criminal activity." Stinson testified that these risk factors provide "a context in which to understand how [appellant] developed morally, how he developed in terms of values and what influence[d] his choices that he ultimately made."

Stinson conceded that [appellant] made a choice when he committed the crimes. However, he opined that [appellant]'s background may reduce his moral culpability for his crimes. And Stinson testified that [appellant] has expressed sincere remorse for his actions.

Stinson diagnosed [appellant] with an untreated bipolar disorder. In support, he cited [appellant]'s reports of feeling alternately sad, energized, irritable, and suspicious of others. He also noted [appellant]'s personal and family history of depression, his difficulty sleeping, and his report of hearing voices. The state's psychologist, Dr. Connell, disagreed with Stinson's diagnosis. Based on his review of the records, Connell opined that the better diagnosis is antisocial-personality disorder.

Stinson also diagnosed [appellant] with drug and alcohol dependence. [Appellant] began using alcohol and marijuana at age 15. Belton told Stinson that by the time he was 17, he was a "minialcoholic." He told Stinson that he drank pints of liquor at a time and sometimes blacked out. At the time of his arrest, [appellant] was using at least one ounce of marijuana a day. At other times, he used as much as one and a half ounces daily. Stinson explained that individuals with untreated mental illness "oftentimes turn to drugs and alcohol" in an effort to self-medicate.

[Appellant]'s full-scale IQ is 89. However, Stinson noted indications of possible brain damage, such as perinatal risk factors, reported head injuries, reported migraines, and other behavioral indicators. Stinson recommended, but did not insist, that defense counsel secure a neuropsychological or neurological evaluation of [appellant]. Because this evaluation did not occur, Stinson's conclusions are based on the assumption that [appellant] does not have brain damage.

iii. Jailhouse behavior

Matthew Martin, a forensic counselor on the maximum-security floor of the Lucas County Correctional Facility, testified about [appellant]'s behavior in jail since his arrest. [Appellant] had been on Martin's floor for three years, after initial placements on suicide watch and then another floor. According to Martin, [appellant] is polite and can exercise self-control.

10.

Martin testified that [appellant] hardly ever had discipline problems while on his floor. According to Martin, [appellant] had been selected as a trustee, a privilege reserved for well-behaved inmates. Martin explained that [appellant] was removed from that position only because a jail captain thought his case was too high profile.

On rebuttal, the state introduced reports from the jail's disciplinary board dated from 2008 to 2011. The reports document [appellant]'s attack on a special-needs inmate, physical altercations with other inmates, disregard of instructions, and possession of contraband. In July 2009, [appellant] challenged a shift commander to a fight, stating, "I'm facing the death penalty. I ain't got nothing to lose." Personnel suspected [appellant] was trying to manipulate his placements in the jail, and one report indicated that [appellant] may be "a hard placement." [Appellant] also made repeated requests for painkillers, which Dr. Connell described as suspicious, drug-seeking behavior.

Dr. Stinson testified that [appellant]'s prison record shows his potential to adjust to confinement. He explained that although [appellant]'s record is imperfect, it shows improvement over time. [Appellant] was cited in six disciplinary actions in 2009, three in 2010, and three in 2011. According to Stinson, prison is probably the most stable environment [appellant] has ever been in and he has responded well to the structure.

{¶ 8} At the conclusion of the mitigation hearing, the three-judge panel weighed the aggravating circumstance against the mitigating factors and unanimously found that the aggravating circumstance outweighed any and all mitigating factors and therefore sentenced appellant to death.

### Direct Appeal and Postconviction Proceedings

{¶ 9} Appellant filed a direct appeal with the Ohio Supreme Court on June 4, 2012. He then filed a postconviction petition on February 15, 2013, in the trial court. He amended this petition three times, filing his third-amended postconviction petition on July 29, 2013.

{¶ 10} In addition to the postconviction petition, on February 25, 2013, appellant filed a motion for appropriation of funds to hire an expert in forensic psychiatry, a motion for funds for a neuropsychologist to perform ADHD testing, and a motion for leave to conduct discovery.

{¶ 11} All postconviction litigation was stayed pending the Ohio Supreme Court's ruling on the direct appeal. On April 20, 2016, the Ohio Supreme Court issued its decision and affirmed appellant's convictions and sentence of death. In its independent sentence evaluation, the court gave significant weight to appellant's family history and background, minimal weight to his adaptability to prison life, and "some weight" to the following: his age (22 at the time of the offense); his lack of significant criminal history; his mental-health problems; and his remorse and acceptance of responsibility. The court found that appellant had "presented significant mitigating evidence that has substantial

12.

weight." However, the court noted that "[a]ppellant shot Dugan at close range, in the back of the head, even though Dugan had cooperated with [appellant]'s demands for money and phone cards. [Appellant] then left Dugan to die and went shoe shopping." The court concluded that the aggravating circumstance outweighed the mitigating factors beyond a reasonable doubt.

{¶ 12} The trial court stayed consideration of appellant's postconviction relief petition for additional periods while appellant continued his appeal process.

{¶ 13} On February 7, 2018, the state filed a motion for summary judgment/motion to dismiss the amended petition for postconviction relief.

**Evidence Presented in Support of Postconviction Relief Petition**

{¶ 14} In support of his postconviction relief petition, appellant provided the court with 26 exhibits, including the following.

*Martha Phillips's Affidavit and Related Exhibits*

{¶ 15} Martha Phillips, a mitigation investigator with the Ohio Public Defender, assisted appellant's postconviction attorneys in investigating potential mitigation evidence, including family members' criminal convictions. A detailed list of these convictions, as well as the records themselves, were included as evidence in support of the petition. Phillips additionally researched the number of residential moves appellant experienced as a child, and these were detailed in Appendix A of her affidavit.

{¶ 16} Phillips also related a conversation she had with a friend of appellant's from San Diego who distinguished appellant's personality from Aaron's, and described

13.

appellant's father's girlfriend's dislike of the brothers and treatment of appellant. In a second affidavit, Phillips stated she called Lucas County Children's Services (LCCS) and was told that there were records listing appellant as an "alleged child victim." Copies of the LCCS records were included as exhibits to the petition.

*Appellant's Affidavit*

{¶ 17} In his affidavit, appellant explained that his behavior at trial[1] was due to his mother's advice that he keep his head up and not show weakness. He also felt the need to show he was "tough and strong." He expressed that he was "extremely sorry" for shooting Dugan. He wrote a letter to Dugan's family to be read at sentencing, but his attorneys did not use the letter or allow him to give an unsworn statement. Had they put him on the stand, he would have expressed remorse and provided additional information about his father. He stated that his father made him feel like he didn't fit in with his family.

{¶ 18} He described his time in San Diego, which he hated. He did not get along with his father's girlfriend, Michelle. He and Aaron had to clean up after her kids and she lied to his father to get him in trouble, which resulted in him being forced to sit in a

---

[1] In his seventeenth claim for relief, appellant argued that trial counsel failed to look into his "poor demeanor at trial" and to explain that it was not due to a lack of remorse. He pointed out that, during the mitigation phase, proceedings were delayed because appellant refused to come out of his cell and be dressed in civilian clothes, and he alleged that he was seen smiling during trial. He also cited to a Toledo Blade article which stated that, while being led away from the courtroom after the verdict, "a smiling" appellant stated he "felt good," and when asked if he was sorry for his actions, answered "no."

14.

car for eight hours while his father worked and getting smacked in the face. One time he ran away from his father's home and stayed at a home across the street. Although his father said he was looking for him, appellant did not believe he had. His father also commented that he "should have aborted [appellant's] ass." While in California, appellant's best friend was killed by a gang member, which "was the beginning of a downward spiral for [him]."

{¶ 19} When appellant returned to Toledo, appellant had no further contact with his father, although his father returned to Toledo several times. His father did not visit him in jail, although he attended an early preliminary hearing.

{¶ 20} Appellant was not offered a plea deal, but would have accepted one if offered.

*Aaron Belton's Affidavit*

{¶ 21} Aaron, appellant's brother, commented on appellant's and his life when they were young, including the sudden move to California, and their life in San Diego, where they were exposed to "a lot of gangs and violence" and fighting at school. Aaron said most of their friends in San Diego were "full-fledged gang members" and that appellant joined the Bloods at 14 after he "had been jumped by the Crips." Aaron discussed their sudden return to Toledo, and recalled the brothers did not have any contact with their father for four years, despite the fact that the father occasionally was in Toledo.

15.

{¶ 22} Upon returning to Toledo, Aaron calmed down, but appellant "kept living more fast-paced, like he did in California." Appellant lived at "Big Mama's house on Cuthbert Road" (Marian Dotson's home) when he returned from Toledo, but Aaron did not. Aaron described the home as in a rough area and there was "not a lot of food * * * and nowhere to sleep." He stated appellant hung out with gang members while living at Big Mama's house. He acknowledged that a lot of people in his family have criminal histories, including three cousins and an uncle who were convicted of murder. Aaron also believed that the way they were raised affected appellant more because he was older.

*Chris Belton's Affidavit*

{¶ 23} Chris, appellant's brother, averred that when he was a child, Kim and his father, Christopher Sr., would argue, and Kim told him that his father would get drunk and hit her. Chris never saw the abuse, but appellant did. Chris stated Kim did drugs when they were young, and he described staying the night at his Aunt Emily's house who also did drugs and was "mean." He recalled at one point his family lived with his Aunt Sherrie, who also used drugs.

{¶ 24} When appellant and Aaron moved to California, Chris lived with his dad. Chris's father made him go to school and stay in the house and he believes these things helped him. He thinks things were harder for appellant who, as oldest, felt he had to show how tough he was as the "big brother" and "saw the worst part of his dad and the worst part of [their] mother's drug use." Chris also described appellant's life in

16.

California and Big Mama's house as "basically a flop house" that was in a rough area. He stated that his mother's side of the family, the Dotsons, "killed and raped people."

*Kim Harold's Affidavit*

{¶ 25} Kim, appellant's mother, averred her mother gave birth to her when she was 15; she lived with her grandparents until she was five and then was in foster care until her mother could take care of her. Kim gave a history of her mother's family (the Dotsons), including her mother's 13 siblings and their children. Numerous members of the Dotson family have drug problems and criminal records, including two convicted of murder, one convicted of rape, and another in prison for molesting his stepgrandson. Kim described "a lot of incest" in the family, including her grandfather molesting her aunt, and her uncles raping her mother. She stated that her stepfather was abusive and once her biological father threatened to whip her.

{¶ 26} Kim recalled Anthony Sr. was "never really there" for appellant and Aaron. When the brothers returned from California alone, by bus, they "hardly heard from their father." She thinks appellant was hyperactive as a child, as he talked too much whereas Chris and Aaron were "younger and quieter." She blames "the bad crowd" appellant was hanging out with for him shooting Dugan, as appellant is a follower. She also explained that she told appellant to "keep his head up and smile during the trial"

*Tiesha Vassar's Affidavit*

{¶ 27} Tiesha, appellant's second cousin, stated she and appellant were close as children and she knew him well, which she believes is due to the fact that they were very

similar - impulsive and not able to control their behavior. She stated that "[t]he Dotson family has a reputation and we're all trying to live it down." After returning from California, appellant and Tiesha saw each other "almost every day." He babysat for her daughter and she thought he was "great" with her daughter and responsible. Although appellant was friends with drug dealers, he respected her rules and did not bring them around her house. One time she saw Kevin Washington, a friend of appellant's and a drug dealer, punch appellant, but appellant did not hit him back. Tiesha recalled that, when the story got around, "people were telling [appellant] he got punked" and he was embarrassed.

{¶ 28} Tiesha also detailed the Dotson family's history of legal problems and said the family, including the women, has a "reputation for fighting and violence." She thinks that appellant's brothers avoided getting into trouble because they were calmer and not impulsive like appellant.

*Lamonte Hopings's Affidavit*

{¶ 29} Lamonte, appellant's cousin, also discussed appellant's "chaotic" household growing up, including Kim's drug abuse, frequent moves, and minimal furniture in the home. Lamonte said he and his mother would go pick appellant and his brothers up because Kim would leave them alone when they were "quite young" to go out and use drugs. He also described his family as "a family of fighters" who are told they should "never be a coward or back down from confrontation." He listed numerous

18.

examples, including seeing Kim, his mother, and his Aunt Karen all fighting on different occasions.  Additionally, he stated that he had seen Kim and Christopher Sr. fight "a lot."

{¶ 30} Lamonte detailed the family "legacy" of getting into trouble, and he himself is (when he signed the affidavit in 2013) incarcerated for murder and both of his brothers have been to prison.  His one brother was imprisoned for a murder he committed as a juvenile, which also involved two of his other cousins.  Lamonte described appellant as "loud and eager and want[ing] to be noticed and seen" when he returned from California, and he thinks appellant's gang affiliation in San Diego had "a major influence" on him.  Appellant sold weed for Lamonte, although he wasn't good at selling it because he either smoked it or gave too much away.

*David Johnson's Affidavit*

{¶ 31} David Johnson was appellant's fifth grade teacher.  He described appellant as talkative and active in his class, and he thinks appellant might "have suffered from some kind of hyperactive disorder, but he was never placed in any special education classes."  Appellant told him he played a lot of video games at home, including violent ones, and once he went to appellant's home to speak with Kim and it seemed that she and her boyfriend had been smoking weed.  The neighbors told him Kim also smoked crack.

{¶ 32} Johnson thinks appellant was "affected by his father's absence"; when Johnson pulled appellant aside to talk about his behavior, appellant would "sometimes cry about his situation at home – that his dad wasn't there and that another guy was."  He

19.

noted appellant's behavior improved with the added structure in his classroom and described Aaron and Chris as "much more reserved and easy-going" than appellant.

*Symphonee Cannon's Affidavit*

{¶ 33} Symphonee was appellant's girlfriend. Her grandmother lived next door to Marian Dotson on Cuthbert Road. Symphonee was afraid of most of the Dotsons and her grandmother never let her go to the Dotson house, which she described as "dark and messy and looked like a condemned house." She said there were a lot of people in and out of the house and there was loud music, partying, "frequent altercations" and often the police were there. She thought the Cuthbert neighborhood was bad for appellant because there were a lot of gangs and street people. When she met appellant, Symphonee "was surprised to learn how nice he was. He did things for [her] * * * and was great with [her] son." She described appellant as hyper, restless, impulsive, with a bad temper, although "he wasn't an angry person." Appellant sometimes broke down crying around her, and said he didn't have anyone. Symphonee believed appellant got into more trouble than his brothers because he "hung out with a bad crowd and was more of a follower."

{¶ 34} Once he was arrested, appellant called Symphonee crying, and told her "he didn't mean to kill the victim and that he was having nightmares about it." When she asked him why he laughed in court and told the cameras he wasn't remorseful, he told her "he said it out of anger because he knew things were against him." She said that "arrogant attitude is not [appellant.]"

20.

*Elizabeth Cannon's Affidavit*

**{¶ 35}** Elizabeth, Symphonee's mother, described the Dotson family as "notorious," and the Dotson name as associated with dysfunction and crime. She did not believe appellant stood a chance with his parents, the family history of dysfunction, and no stable influences. Initially, she was upset when Symphonee started dating appellant, but once she met him, she liked him. She described him as pleasant, although she also said he was hyperactive, restless, impulsive, talkative, animated and "seemed to want to be noticed."

*Mark Rooks's Affidavit*

**{¶ 36}** Rooks, a mitigation specialist, testified that, during trial, the attorneys did not obtain a court order for Children Services records, nor did he request these records. He also never told the attorneys that there were no records from Children Services or Job and Family Services.[2]

*Expert Witness Testimony*

**{¶ 37}** Appellant provided the court with the affidavits of three experts: Dr. Stinson, Dr. Rahn Minagawa, and Dr. Peggy Giordano.

---

[2] Appellant's thirteenth claim for relief alleged trial counsel were ineffective for failing to request or receive Kim's Lucas County Department of Job and Family Services (LCDJFS) records and his twenty-first claim for relief alleged trial counsel did not obtain and present LCCS records.

*Dr. Stinson's First Affidavit*

{¶ 38} Dr. Stinson was asked to review transcripts from his and Dr. Connell's mitigation phase testimony as well as "transcripts from the presentation of exhibits and closing argument following Dr. Connell's testimony." In addition, he reviewed records given to him by Phillips, the postconviction mitigation investigator, including write-ups of interviews done with, inter alia, the above-referenced lay-witnesses and a document detailing appellant's family's criminal history.

{¶ 39} After reviewing these items, in his first postconviction affidavit, Dr. Stinson discussed what information from Dr. Connell's testimony he could have corrected or clarified if he had been called in rebuttal, and how the new information provided by Phillips would have assisted in his evaluation and mitigation testimony.

{¶ 40} Dr. Stinson related numerous ways in which it would have been beneficial to call him in rebuttal. He could have clarified that he had been informed by Kim herself, not medical records, that she had used marijuana during her pregnancy. Additionally, he could have explained, or "explained in greater detail":

- that Kim's and Googin's depression and suicide attempts placed appellant at greater risk of developing depression or another mood disorder including dysthymic disorder and bipolar disorder;

- the differences between perinatal problems and a "difficult childbirth" and the risks associated with perinatal problems;

- that "the literature shows that children exposed to certain events are at an increased risk for negative outcomes by virtue of being exposed to the event - regardless of their subjective experience at the time or following the event";

- that the standard is best interest of the child and therefore, Dr. Connell's statement that "there is something to be said for a mother who wants to keep custody of her children" was "misguided";

- that dysfunction in a family for purposes of death penalty mitigation should not be measured by involvement from children's services;

- that appellant's transitions and disruptions were critical risk factors;

- why his previous testimony regarding precursors to violent crime was correct, as was his diagnoses;

- that the record did not support a claim that appellant was drug-seeking;

- that appellant's report of hallucinations was consistent with genuine hallucinations;[3]

---

[3] In his trial testimony, Dr. Stinson testified that appellant was having auditory hallucinations, which were described as mumbling and whispering. Dr. Connell later testified that auditory hallucinations are not vague or mumbling. And Dr. Connell commented that auditory hallucinations are easy to fabricate, but difficult to report in a way that is consistent with actual mental illness.

23.

- that Dr. Connell's testimony regarding certain tests was inaccurate;

- why appellant might have been remorseful and yet it not be reflected in the records;

- that appellant's rate of recidivism for a violent crime differs depending on whether he is in prison, or unsupervised in the community.

{¶ 41} He believed he could have corrected misstatements about, and further elaborated on: bipolar disorder; whether there was evidence of clinical depression in the record; and, Dr. Connell's "misunderstanding" about trauma and how it effects the brain function of children, regardless of whether the diagnostic criteria for PTSD are met. He also could have established that "the functioning of [appellant's] parents was poor" and that Dr. Connell was incorrect in stating that there was "stability of the family."

{¶ 42} Dr. Stinson affirmed the additional records Phillips provided to him would have been important in furthering his evaluation and testimony during the mitigation phase. Specifically, he points out that the records reveal "a more extensive family criminal history," "more residential transitions," "additional abuses," and "identities of other family members, friends, and an ex-girlfriend who would have been willing to talk to [him] and/or members of [appellant's] defense team." He alleges that he was not given accurate information about appellant and his father's relationship, and he should have been given details regarding appellant's prescription of Depakote. He regrets not more strongly recommending a neurological or neuropsychological evaluation be completed

24.

since "there are a number of indications of neurological or neuropsychological impairment."

*Dr. Stinson's Second Affidavit*

**{¶ 43}** In a second affidavit, made after Dr. Stinson received records from LCCS, he references information in those records that would have been important, including: (1) complaints that Kim was neglectful; (2) that when Aaron was born with "intensive medical needs," Kim was thought to be suffering from post-partum depression and was overwhelmed and isolated; (3) that their home sometimes did not have gas, electricity, or hot water; (4) that Kim was, at times, uncooperative with social service agencies trying to help her; (5) that at one point, Kim expressed a desire to surrender both appellant and Aaron for adoption; (6) information regarding Anthony Sr.'s lack of interest in the children; (7) Kim did not have a good support system; (8) there were allegations of drug abuse and leaving the children home alone; (9) Kim's boyfriend "may have been selling drugs"; (10) Kim was sexually molested as a child and never received counseling; (11) Kim's discipline included "whoopings" with a belt, her hand, or a shoe; (12) appellant's grandfather once picked him up and threw him in a corner; (13) the children were exposed to physical confrontations, domestic violence, guns, and extremely intoxicated adults; and (14) Kim threatened to kill herself and her children.

*Dr. Minagawa's Affidavit*

**{¶ 44}** Dr. Minagawa identified, inter alia, the following "issues and concerns" involving appellant's mitigation defense: (1) witnesses were not called to testify about

appellant's "childhood and adolescent history of exposure to acts of violence, traumatic experiences and losses, and problems with impulse control and hyperactivity were not fully explored"; (2) "evidence of [ADHD] observed by family members, friends, his teacher, and an evaluating therapist was not presented during his trial, nor was it assessed prior to the onset of his trial"; (3) appellant was likely misdiagnosed at Connecting Point and was not "referred for a medication consultation to address his depression or impulse control disorders"; (4) the "lack of clinical or academic interventions" was not presented; (5) Dr. Connell's testimony was not rebutted; (6) the issue of choice was addressed in a misleading fashion and appellant's lack of choice "was not explored in terms of being exposed to numerous risk factors, and his lack of protective factors," which were not his choice; (7) Berry's testimony was misleading in that it painted a picture of familial support and normative behaviors, as well as non-problematic home and school experiences; and (8) it would have been more beneficial to conduct a developmental assessment of appellant to explain "how the presence of risk factors, and the lack of protective factors, can cause significant deviations from normal child and adolescent development."

### *Dr. Giordano*

{¶ 45} Dr. Giordano is a criminologist specializing in risk factors associated with juvenile delinquency, adult crime, and violent behavior. She discussed the various risk factors which impacted appellant, including: maternal drug use; maternal criminality and incarceration; numerous residential moves; housing instability; family dysfunction

26.

(including drug use, crime, violence, abuse, antisocial behavior) throughout the extended family; neighborhood and school environment; witnessing domestic violence; suffering neglect; his lack of a relationship with his father; and his position as oldest child. She also noted appellant's lack of a significant criminal history should be considered in mitigation.

*Other Evidence*

{¶ 46} In addition to the foregoing, appellant provided the trial court with the following: LCDJFS records, which appellant argues are relevant to demonstrate Kim's financial hardships while raising him, to confirm their frequent residential moves, and to highlight Kim's self-destructive behavior; LCCS records which included evidence regarding Kim's drug use and that appellant was neglected throughout his childhood; an academic article entitled *The Adolescent Brain*, that appellant cites in support of his argument that his trial counsel did not effectively present youth as a mitigating factor; a 1991 Los Angeles Times article and a San Diego Reader article about Gompers High School, both of which appear relevant to the issue of the atmosphere of the schools attended by appellant in San Diego; a Toledo Blade article which appellant cites for references to his demeanor at trial; a list of persons incarcerated in Lucas County for aggravated murder involving an aggravated robbery; and a death penalty clemency report for John Eley.

**Trial Court's Decision and Appeal**

{¶ 47} The trial court granted the state's motion for summary judgment and denied appellant's postconviction petition without a hearing. The opinion did not address appellant's motion requesting discovery or his motions requesting funding for experts.

{¶ 48} Appellant appealed this decision on July 29, 2020. He then requested we stay the decision pending a decision from the Ohio Supreme Court in *State v. Blanton*, Supreme Court case No. 2021-0172. We granted this request. On November 10, 2022, the Ohio Supreme Court decided *State v. Blanton*, Slip Opinion No. 2022-Ohio-3985 and the parties supplemented their briefs to discuss *Blanton*.

**Assignments of Error**

[1.] The trial court erred by applying the doctrine of *res judicata* to bar [appellant]'s [claims] for relief.

[2.] The trial court abused its discretion and denied [appellant] due process, when it summarily dismissed [appellant]'s claims that his trial counsel rendered [a] constitutionally deficient performance during the mitigation phase of his capital trial, and in failing to grant relief on the meritorious ineffective assistance of counsel claims.

[3.] The trial court erred by denying [appellant]'s postconviction petition without allowing him to conduct discovery.

[4.] The trial court erred in denying [appellant]'s motions for appropriation of funding for mental health experts.

[5.] The trial court abused its discretion in dismissing [appellant]'s postconviction petition when he presented sufficient operative facts to merit relief, or, at minimum, an evidentiary hearing.

[6.] The trial court abused its discretion when it denied [appellant]'s nineteenth [claim] for relief.[4]

[7.] The trial court abused its discretion when it denied [appellant] factual development and relief on the twenty-second and twenty-fifth claims for relief.[5]

## Applicable Law

### Generally

{¶ 49} Postconviction relief is governed by R.C. 2953.21 and "is not an appeal of a criminal conviction but, rather, is a collateral, civil attack on the judgment." *State v. Calhoun*, 86 Ohio St.3d 279, 281, 714 N.E.2d 905 (1999).

{¶ 50} "Initial petitions for postconviction relief under R.C. 2953.21 may be resolved in one of three ways. The trial court may (1) summarily dismiss the petition without holding an evidentiary hearing * * *, (2) grant summary judgment on the petition to either party who moved for summary judgment * * *, or (3) hold

---

[4] Appellant's nineteenth claim for relief alleged that his death sentence was disproportionate to similarly situated defendants in Lucas County.

[5] These claims for relief alleged that the cumulative effects of the trial court's errors deprived him of a right to a fair trial.

an evidentiary hearing on the issues raised by the petition * * *." *State v. Harris*, 12th Dist. Butler No. CA2019-07-121, 2020-Ohio-4101, ¶ 14.

### Bases for Denying Postconviction Relief Without a Hearing

*No Substantive Grounds for Relief*

{¶ 51} A trial court properly denies a postconviction relief petition without a hearing if the supporting affidavits, the documentary evidence, the files, and the records of the case do not demonstrate that the petitioner set forth sufficient operative facts to establish substantive grounds for relief. A criminal defendant challenging his or her conviction through a petition for postconviction relief is not automatically entitled to a hearing. *Calhoun* at 282. Before granting a hearing on a petition, a trial court "must evaluate the petition in the context of the entire record in the case to determine whether the petition alleges 'substantive grounds for relief.'" *Blanton*, Slip Opinion No. 2022-Ohio-3985, at ¶ 24, quoting R.C. 2953.21(D). "A petition presents substantive grounds for relief when it contains allegations that are sufficient to state a constitutional claim and the files and records of the case do not affirmatively disprove the claim." *Id*., citing *State v. Milanovich*, 42 Ohio St.2d 46, 50, 325 N.E.2d 540 (1975); R.C. 2953.21(F).

*Res Judicata*

{¶ 52} Another basis for denying a postconviction petition without a hearing is that the claims are barred by res judicata. "The doctrine of res judicata bars someone from raising a claim that could have been raised and litigated in a

prior proceeding. * * * So a court reviewing a postconviction-relief petition *generally* may not decide a claim that could have been presented at trial and raised on direct appeal." (Emphasis added.) *Blanton* at ¶ 2, quoting *State v. Perry*, 10 Ohio St.2d 175, 180, 226 N.E.2d 104 (1967).

{¶ 53} However, as noted by the Ohio Supreme Court in *Blanton*, postconviction petitions claiming ineffective assistance of counsel "pose unique challenges." *Id.* at ¶ 29. In these cases, res judicata does *not* bar claims for postconviction relief, inter alia, when a petitioner "must rely on evidence outside the trial record to establish his claim for relief." *Id.* at ¶ 2, citing *State v. Cole*, 2 Ohio St.3d 112, 113-114, 443 N.E.2d 169 (1982). Under this rule, the introduction of evidence dehors the record in a petition for postconviction relief under R.C. 2953.21 is generally sufficient enough to avoid dismissal on the basis of res judicata. *Id.* at ¶ 31.

{¶ 54} Yet, overcoming the res judicata bar is not sufficient enough to entitle a petitioner to a hearing. *Id.* at ¶ 31. To be entitled to a hearing, a party "must proffer evidence which, if believed, would establish not only that his trial counsel had substantially violated at least one of a defense attorney's essential duties to his client but also that said violation was prejudicial to the [petitioner]." *Id.* at ¶ 31, quoting *Cole* at 114.

{¶ 55} Pursuant to *Blanton,* to determine whether appellant is entitled to a hearing, we must conduct a two-prong inquiry. In the first prong, we must

31.

determine whether appellant "introduced competent evidence of ineffective assistance that was not included in the trial record?" *Id*. at ¶ 33. If so, the second prong is whether "that evidence present[s] substantive grounds for relief; that is, if believed, would the newly presented evidence—together with any evidence in the trial record—establish that counsel was ineffective?" *Id*. The Ohio Supreme Court observed that courts often conflate these two inquiries and that "[t]he better practice is to treat these two inquiries as analytically distinct." *Id*. at ¶ 34.

### Standard of Review

{¶ 56} Generally, we review the denial of an application for postconviction relief for an abuse of discretion. *State v. Gondor*, 112 Ohio St.3d 377, 2006-Ohio-6679, 860 N.E.2d 77, ¶ 58. To find an abuse of discretion, we must conclude the trial court's judgment is "so profoundly and wholly violative of fact and reason that 'it evidences not the exercise of will but perversity of will, not the exercise of judgment but defiance thereof, not the exercise of reason but rather of passion or bias.'" *State v. Weaver*, Slip Opinion No. 2022-Ohio-4371, ¶ 24, quoting *State v. Jenkins*, 15 Ohio St.3d 164, 222, 473 N.E.2d 264 (1984). However, an exception to this general rule applies when the trial court summarily denies a petition on purely legal grounds, such as res judicata. *State v. Boaston*, 6th Dist. Lucas No. L-17-1278, 2021-Ohio-360, ¶ 44. In such cases, our review is de novo. *Id*.

## First Assignment of Error

{¶ 57} Appellant maintains that the trial court erred in denying the tenth, eleventh and nineteenth claims for relief on the basis of res judicata.[6]

### Tenth Claim for Relief

{¶ 58} Appellant alleged in his tenth claim for relief that his trial attorneys failed to adequately investigate his history and direct Dr. Stinson, who testified at trial. In support, appellant cites to Dr. Minagawa's affidavit.

{¶ 59} The trial court found appellant's tenth claim for relief barred by res judicata. Reviewing the claim de novo, under the first prong in *Blanton,* we find that the application of res judicata to this claim was error as appellant relies on competent evidence outside of the record. However, this finding does not necessarily require reversal, as under the second prong, we must also determine whether this evidence, if believed, sets forth substantive evidence of ineffective assistance of counsel. We discuss the substantive merits of appellant's ineffective assistance of counsel claims in appellant's second assignment of error. We will analyze the substantive merits of appellant's tenth claim for relief then.[7]

---

[6] Appellant argued that the trial court effectively denied nearly all of his claims through res judicata when it found, in considering other claims for relief, that evidence was cumulative to, or alterative to evidence presented at trial. We disagree. This finding is also relevant to whether there was ineffective assistance of counsel. Thus, we limit our analysis to those claims in which the trial court specifically applied res judicata.

[7] Appellant argues that we should remand this issue to the trial court to first address this issue in light of *Blanton*. He cites to *State v. Rickard*, 6th Dist. Wood Nos. WD-19-030, WD-19-031, 2020-Ohio-294, where after reversing a trial court's decision that a

33.

**Eleventh Claim for Relief**

{¶ 60} In his eleventh claim for relief, appellant argued that trial counsel did not adequately present his youth as a mitigating factor. He maintained that the defense failed to argue that the court should "consider the individual characteristics of [appellant's] maturity, understanding, and mental capabilities in assessing the weight to assign to his youth" and did not "properly cite to specific instances in [appellant's] background and history that would have favored the assignment of more weight."

{¶ 61} In support, appellant relied on an academic article, Casey, Jones, and Hare, *The Adolescent Brain*, 1124 Ann. N.Y. Acad. Sci. 111 (March 2008), which he argued shows that "careful discrimination between young offenders of the same age is vital because adolescence is a period of 'changes in physical, psychological, and social development' and these changes are extremely individualized, dependent upon one's own exposure to harms such as injury, depression, anxiety, drug use and addictions."

---

postconviction petition was untimely we found that we could not consider the merits of the petition because "[d]ue to our role as a reviewing court, we cannot make a determination regarding the merits of an argument in the first instance." *Id.* at ¶ 16, quoting *Cohen v. Dulay*, 2017-Ohio-6973, 94 N.E.3d 1167, ¶ 21 (9th Dist.). We note that the trial court did make a determination regarding the merits of this claim. Specifically, the trial court stated that "[a] different conclusion by a new expert which is based on essentially the same evidence presented at trial is insufficient to demonstrate ineffective assistance of counsel." The court then went on to state that "the basic information on which [Dr.] Minagawa relies *** was presented to the court. Dr. Stinson testified about [appellant's] symptoms being consistent with [ADHD] as well as a possible diagnosis of bipolar disorder." The court ultimately concluded that the claim was barred by res judicata and "does not establish ineffective assistance of counsel." Therefore, we can consider the merits of the claim.

**{¶ 62}** We agree with the trial court that this claim was barred by res judicata, although not for the reasons relied upon by the trial court. The trial court, in part, found that appellant's eleventh claim for relief was barred by res judicata because this article was available at the time of trial and the evidence did not demonstrate that appellant could not assert this claim through his new counsel on direct appeal. In *Blanton*, the court stated that, in the context of ineffective-assistance claims raised in a postconviction petition, "[t]here is no requirement that to overcome a res judicata bar, the evidence on which such a claim is based must have been unknown or unavailable to the defense at trial." *Blanton*, Slip Opinion No. 2022-Ohio-3985, at ¶ 60.

**{¶ 63}** Although the fact that the article existed at the time of trial is not a basis for finding res judicata, we find that appellant has not presented competent evidence, and thus, res judicata applies. Youth was presented as a mitigation factor at trial. As the trial court pointed out, "the Ohio Supreme Court accorded 'some' weight to [appellant's] youth during its independent weighing of the evidence." Although appellant attempted to avoid res judicata by attaching an academic article, this is not competent evidence. Outside materials submitted in support of a postconviction relief petition must adhere to the rules of evidence; unreliable documents are not sufficient. *State v. Harris*, 8th Dist. Cuyahoga No. 89156, 2008-Ohio-934, ¶ 38.

**{¶ 64}** In *Beard v. Meridia Huron Hosp.*, 106 Ohio St.3d 237, 2005-Ohio-4787, 834 N.E.2d 323, ¶ 23, the court stated that "[b]ecause works of professional literature contain statements that if introduced as evidence would fall within the definition of

35.

hearsay, and because the Ohio Rules of Evidence *** do not contain a learned-treatise exception to the hearsay rule, *** such works 'are inadmissible as independent evidence of the theories and opinions therein expressed.'" While Ohio now has a learned-treatise exception in Evid.R. 803(18), this rule only provides an exception to the hearsay rule when the learned treatise is "called to the attention of an expert witness upon cross-examination or relied upon by the expert witness in direct examination." As provided in the comments to Evid.R. 803, "statements in learned treatises come to the trier of fact only through the testimony of qualified experts who are on the stand to explain and apply the material in the treatise." Here, the article at issue is not relied upon by any expert. Therefore, we find it is hearsay and we do not find the article to be competent evidence sufficient to overcome res judicata.

{¶ 65} Since appellant has not presented competent evidence outside of the record, and as his youth was raised at trial, we find the trial court did not err in finding the eleventh claim for relief to be barred by the doctrine of res judicata.

<h3 style="text-align:center">Nineteenth Ground for Relief</h3>

{¶ 66} The trial court additionally found appellant's nineteenth claim for relief was barred by res judicata. In this claim, appellant argued his death sentence was disproportionate to other similarly situated capital defendants in Lucas County. In support, he provided the court with his Exhibit V, entitled "Current Lucas County Incarcerations for Aggravated Murder involving an Aggravated Robbery." The trial court noted that the Ohio Supreme Court already concluded that the imposition of the

death penalty in this case was proportionate to other similar cases in its review of appellant's direct appeal. *See Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 196. The trial court dismissed this ground both on the merits and as barred by the doctrine of res judicata.

{¶ 67} This claim is not based on ineffective assistance of counsel, and thus, the general rule barring claims in postconviction relief petitions that were or could have been raised on appeal applies. This claim was raised on direct appeal and thus, the trial court did not err in finding it barred by the doctrine of res judicata.

{¶ 68} For these reasons, we find appellant's first assignment of error well-taken with respect to his tenth claim for relief, and not well-taken with respect to the eleventh and nineteenth claims for relief.

## Second and Fifth Assignments of Error

{¶ 69} As they are related, we will consider appellant's second and fifth assignments of error together.

## Arguments

{¶ 70} In his second assignment, appellant argues that the trial court abused its discretion, and denied him due process, by summarily dismissing his ineffective assistance of counsel claims. In his appellate brief, he argues that his trial counsel were deficient during the mitigation phase, both by failing to "investigate, prepare, and present relevant expert testimony on important mitigation issues concerning his mental health," and by failing "to fully and effectively present, or to present at all, the testimony of

37.

numerous family members, friends, and teachers, who were all available and could have provided important mitigation evidence."[8]  He contends that, "at the very least, there are genuine issues of material fact, which preclude judgment for the state, and [appellant] is entitled to discovery and an evidentiary hearing."

**{¶ 71}** In his fifth assignment of error, appellant asserts that the trial court abused its discretion when it failed to grant relief, or, at minimum, an evidentiary hearing despite the fact that he presented sufficient evidence to support a claim of constitutional error.

### Applicable Law Regarding Ineffective Assistance of Counsel

**{¶ 72}** "To establish ineffective assistance, appellant must (1) show that counsel's performance 'fell below an objective standard of reasonableness' as determined by 'prevailing professional norms' and (2) demonstrate 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.'" *State v. Wilks*, 154 Ohio St.3d 359, 2018-Ohio-1562, 114 N.E.3d 1092, ¶ 140, quoting *Strickland v. Washington*, 466 U.S. 668, 688, 694, 104 S.Ct. 2052, 80 L.Ed.2d 674 (1984).

### *Whether Hearing is Required*

**{¶ 73}** The above standard applies when we determine the merits of a postconviction petition.  However, when the issue is whether to grant a hearing on a

---

[8] We note that rather than individually discussing his claims for relief in which he alleged ineffective assistance of counsel (including the tenth claim), appellant now argues these claims for relief collectively.  We will do the same.  We also observe he has not raised any argument regarding his eighteenth claim for relief.

38.

postconviction petition, rather than as to the merits of the postconviction petition, the Ohio Supreme Court in *State v. Bunch*, Slip Opinion No. 2022-Ohio-4723, has stated that the postconviction petition does not need to definitively establish that trial counsel was deficient, or that appellant was prejudiced. *Id*. at ¶ 27. "Instead, the petition must be sufficient on its face to raise an issue whether [appellant] was deprived of the effective assistance of counsel, and [appellant]'s claim depends on factual allegations that cannot be determined by examining the record from his trial." *Id*.

{¶ 74} Appellant has argued that the court erred in not providing a hearing, in addition to arguing the merits of his claims. To be entitled to a hearing, he must raise in his petition a triable issue of fact, supported by evidence outside the record, that his trial counsel were deficient and that he was prejudiced by that deficiency. *See id*. at ¶ 37.

{¶ 75} The United States Supreme Court has also counseled that "[a] court need not first determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant as a result of the alleged deficiencies. If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, that course should be followed." *Strickland* at 670. *See also State v. Madrigal*, 87 Ohio St.3d 378, 389, 721 N.E.2d 52 (2000) ("A defendant's failure to satisfy one prong of the *Strickland* test negates a court's need to consider the other.").

{¶ 76} Because we believe appellant's petition is not sufficient on its face to raise an issue as to whether he was prejudiced by the alleged trial counsel deficiencies, it is not necessary to consider the first prong of the *Strickland* test in determining whether trial

39.

counsel's performance was deficient.   We will begin our analysis with the second prong, whether the petition raises an issue that he has been prejudiced by the alleged errors.

### Presumed Prejudice

{¶ 77} Appellant first suggests that prejudice should be presumed, citing *United States v. Cronic*, 466 U.S. 648, 104 S.Ct. 2039, 80 L.Ed.2d 657 (1984).  In *Cronic*, the United States Supreme Court found that there are circumstances so likely to prejudice the accused that prejudice should be presumed.  *Id.* at 658 - 659.  One such circumstance is "if counsel entirely fails to subject the prosecution's case to meaningful adversarial testing." *Id*. at 659.  The United States Supreme Court later emphasized that this failure must be complete. *Bell v. Cone*, 535 U.S. 685, 697, 152 L.Ed.2d 914, 122 S.Ct. 1843 (2002).

{¶ 78} Appellant contends that "[t]he level of the deficient performance by [his] trial counsel in the mitigation phase was to such a degree that counsel was effectively absent during mitigation, thereby entitling [appellant] to presumed prejudice under *Cronic*."  We disagree.  Appellant's counsel hired Rooks to conduct an investigation (which included interviewing appellant and multiple family members and obtaining school, employment, and medical records) and Dr. Stinson to complete a mitigation evaluation.  And, as stated by the Ohio Supreme Court, appellant's trial counsel "presented significant mitigating evidence that has substantial weight." *Belton*, 149 Ohio St.3d 165, 74 N.E.3d 319, 2016-Ohio-1581, at ¶ 195.  We do not find this presumption applies here.  Therefore, appellant must establish prejudice.

40.

**Test for Prejudice**

{¶ 79} To establish prejudice, a "defendant must prove that there is a 'reasonable probability' that counsel's deficiency affected the outcome of the defendant's proceedings." *Bunch*, Slip Opinion No. 2022-Ohio-4723, at ¶ 26, quoting *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* As the issue here is whether appellant was appropriately sentenced to death, "the question of prejudice turns on 'whether there is a reasonable probability that, absent the errors, the sentencer-including an appellate court, to the extent it independently reweighs the evidence-would have concluded that the balance of aggravating and mitigating circumstances did not warrant death.'" *Hill v. Mitchell*, 400 F.3d 308, 314 (6th Cir.2005), citing *Strickland* at 695. Because a hearing was not had below, the question before us is whether appellant's petition was sufficient on its face to raise the issue as to prejudice. *See Bunch* at ¶ 27.

{¶ 80} To establish prejudice "the new evidence * * * must differ in a substantial way—in strength and subject matter—from the evidence actually presented at sentencing." *State v. Herring*, 142 Ohio St.3d 165, 2014-Ohio-5228, 28 N.E.3d 1217, ¶ 117, quoting *Hill* at 319. New evidence in mitigation that is "merely cumulative" of evidence already presented is not sufficient to establish prejudice. *Herring* at ¶ 117.

41.

## Ineffective Assistance of Counsel Claims

{¶ 81} On appeal, appellant claims his trial counsel were ineffective in failing to (1) adequately investigate, prepare, and present expert testimony, and (2) fully and effectively present, or to present at all, the testimony of lay witnesses.

{¶ 82} The trial court concluded, inter alia, that the evidence in support of appellant's claims for ineffective assistance of counsel, was cumulative and did not differ in strength and subject matter from the evidence presented at trial.[9]  We agree.

{¶ 83} As discussed in detail above, appellant's counsel presented a comprehensive range of evidence outlining several mitigating factors including his history and background, his youth, his lack of significant criminal history, his mental-health problems, remorse, acceptance of responsibility, and his adaptability to prison.

{¶ 84} For the reasons we will discuss below, we do not find that appellant's new evidence differs in a substantial way from the evidence presented at mitigation. Additionally, we do not find significant strength in the evidence as to raise an issue as to whether a trier of fact would have reached a different outcome.

### Failure to Investigate, Prepare, and Present Relevant Expert Testimony

{¶ 85} Appellant argues that his expert affidavits offer evidence substantially different in strength and subject matter from that presented to the three-judge panel and

---

[9] Appellant has argued that the trial court's findings of facts and conclusions of law were insufficient in that they did not specifically state the reasons for the dismissal of certain claims.  We find the trial court's opinion sufficient to provide us a meaningful basis for review.

42.

establish that trial counsel failed to investigate, prepare, and present expert testimony. We disagree.

*Dr. Stinson's Affidavit*

{¶ 86} Appellant argues that Dr. Stinson's affidavit goes far beyond his trial testimony and establishes that had he been aware of the evidence presented to him in postconviction and been called back as a rebuttal witness, he would have been able to "refute Dr. Connell's inaccurate testimony."

{¶ 87} When reviewing Dr. Stinson's list of proposed corrections and clarifications to Dr. Connell's testimony, we find many merely provide additional explanation and further support to his trial testimony, and that in some cases, Dr. Stinson was asked questions in cross-examination on the potential issue. For example, he now wants to testify that whispering is a characteristic of a genuine hallucination and that appellant's report of hallucinations is consistent with bona fide hallucinations, but on cross-examination, he was asked whether "auditory hallucinations are usually clear and not vague or inaudible." With others, there was evidence in the record on the topic he wished to explain. For example, Dr. Stinson declared that he would have explained why "the function of Anthony's parents was poor" and that Dr. Connell's claim that there was "stability in the family" was incorrect. With yet others, the intended rebuttal testimony was handled on cross-examination. For example, Dr. Stinson indicated he wanted to produce copies of email correspondence with Dr. Connell, but on cross-examination, Dr. Connell admitted to these exchanges. Further, Dr. Connell admitted on cross that Dr.

43.

Stinson's opinions were based on different sources of information, and Dr. Stinson had access to more information than Dr. Connell. Through this line of questioning, trial counsel established that Dr. Connell's opinions were limited, as they were based only on a review of the records, not on any personal interviews, or tests conducted by Dr. Connell, and that, the professional standards "frown upon" making a diagnosis without a personal examination.

{¶ 88} Counsel also questioned Dr. Connell regarding the (supposed) absence of LCCS reports, his statements concerning the correlation between an impoverished family and violent crime, PTSD, his statements regarding Dr. Stinson's use of the Woodcock-Johnson test, his statements regarding whether appellant had an alcohol abuse problem, and whether he was aware that Kim was the source of Dr. Stinson's knowledge that she used marijuana during her pregnancy with appellant.

{¶ 89} There was also a line of questioning regarding whether psychologists would ask different questions than a nonpsychologist, and whether the MMPI-1 is a self-reporting test. Additionally, on cross-examination, Dr. Connell was questioned regarding other explanations for appellant requesting Flexeril in jail, rather than drug-seeking. Dr. Stinson himself was also asked about appellant being prescribed Flexeril and whether appellant "engaged in manipulation to obtain drugs" while in jail, to which he responded he didn't think he did. For these reasons, we do not find that recalling Dr. Stinson in

44.

rebuttal would have added anything new in strength or subject matter from evidence already before the trial court.[10]

{¶ 90} Dr. Stinson also alleged that the additional records provided by Phillips "would have been important in furthering [his] evaluation and testimony during the mitigation phase" of trial because the records "revealed a more extensive family criminal history than [he] was aware of; more residential transitions than [he] knew about; additional abuses about which [he] did not know; and the identities of other family members, friends, and an ex-girlfriend who would have been willing to talk to [him] and/or members of [appellant's] defense team." This information is cumulative to testimony at trial. He then specifically stated that the additional records reveal more information about Anthony Sr. and his relationship to appellant and give a more complete understanding of the "pervasiveness and seriousness of the family criminal history"; however, at trial there was much information presented regarding both of these issues.

{¶ 91} Dr. Stinson pointed to his testimony on cross-examination where he was asked about appellant's prescription for Depakote, and he did not have certain details. He contended that he should have known specifics regarding the prescription, "[e]specially since Depakote is a medication used to treat Bipolar Disorder." Testimony regarding

10 As we have found it unnecessary to determine whether appellant's counsels' performance was deficient, we do not render an opinion on whether counsels' decision not to recall Dr. Stinson is reasonable. However, we note that there is evidence in the record supporting the trial court's conclusion that the failure to recall Dr. Stinson was trial strategy. Dr. Stinson was in the courtroom for Dr. Connell's testimony and appellant's attorney specifically asked the judge if Dr. Stinson would be able to stay in the courtroom "should [they] want to call him in rebuttal." Transcript, p. 747.

45.

both the Depakote and bipolar disorder are in the record. We do not find any basis for finding this information would have added any weight to the mitigation evidence.

{¶ 92} Dr. Stinson also wished he had "more strongly recommended that a neurological or neuropsychological evaluation" be completed because there are "a number of indications of neurological or neuropsychological impairment in appellant." He did not detail these indicators in his affidavit, however, these indicators were discussed at trial, where Dr. Stinson stated that "there are a number of risk factors and a number of behavioral indicators that [appellant] is experiencing neurological or neuropsychological impairment" and then he listed numerous indicators. Moreover, in its independent weighing of the evidence, the Ohio Supreme Court accepted that appellant had dysthymia, noted that Dr. Stinson diagnosed him with bipolar disorder, and drug and alcohol dependence, and, observed that although Dr. Connell disagreed with the bipolar diagnosis, Dr. Connell opined that appellant suffered from antisocial-personality disorder. The Ohio Supreme Court then gave appellant's mental-health problems "some weight."

{¶ 93} Dr. Stinson also claimed if he been aware of the LCCS records, he would have testified to the facts found in those records and explained how those "factors lead to disturbances in emotional development, conduct problems, and later negative outcomes, including drug and alcohol abuse, psychological problems, and violence."

{¶ 94} We observe that information in the LCCS records, as well as Dr. Stinson's proposed testimony, is not sufficiently different, in either strength or subject matter, to Dr. Stinson's testimony at trial.

46.

*Dr. Minagawa's Affidavit*

**{¶ 95}** Dr. Minagawa identified certain issues and concerns he had with appellant's mitigation defense. He concluded that witnesses were not called to testify regarding appellant's "childhood and adolescent history of exposure to acts of domestic violence, traumatic experiences and losses." We find these topics were addressed in mitigation; thus, any additional evidence would merely be cumulative to evidence already presented.

**{¶ 96}** The doctor also alleged that "problems with impulse control and hyperactivity were not fully explored." He noted evidence of ADHD was observed by family members, friends, and a teacher, but was not presented during trial, or assessed prior to trial. He stated undiagnosed and untreated ADHD can have a devastating impact. That "[c]hildren with this condition are at risk to develop substance abuse problems, gravitate to a negative peer group, and fail in school" and that 60% will continue to have problems with impulse control, attention, and hyperactivity into adulthood.

**{¶ 97}** Although ADHD was not assessed prior to trial, at trial, Dr. Stinson testified that the Connecting Point records contain evidence of symptoms that would be consistent with ADHD. Moreover, appellant's other mental health issues were discussed and given "some weight" by Ohio Supreme Court. Further, there was testimony in the record that appellant exhibited many of the possible negative consequences discussed by Dr. Minagawa and that other factors in appellant's life, not within his control, could lead to the same negative consequences.

47.

{¶ 98} Dr. Minagawa took issue with the testimony of Linda Berry, who he claimed "painted a picture of familial and support and normative behaviors" and "implied that appellant's home and school experiences were nonproblematic." Yet, we find extensive evidence in the record countering those suggested implications. He also referred to a statement by Berry that appellant failed to keep an appointment with a doctor at Connecting Point when he was to be assessed for medication, which he argued indicates appellant "rejected" opportunities for help. The doctor then referenced a Connecting Point assessment performed on appellant which indicated he was not referred for a physician or psychiatrist appointment. We note the Connecting Point records, including the document referred to by Dr. Minagawa to show the absence of a referral, were before the trial court.

{¶ 99} Dr. Minagawa further alleged that trial counsel erred in not recalling Dr. Stinson to clarify misleading statements made by Dr. Connell regarding bipolar disorder. As discussed above, we do not find recalling Dr. Stinson would have added any evidence significantly different from that presented at trial in support of mitigation.

{¶ 100} Dr. Minagawa also suggested the trial court should have retained a psychiatrist to confirm the diagnosis of bipolar disorder and identify the clinical interventions indicated. Dr. Stinson diagnosed appellant with bipolar disorder and explained the disorder to the court at trial. We find the additional suggested testimony would not differ in strength and subject matter from Dr. Stinson's testimony.

{¶ 101} Dr. Minagawa also objected to the manner in which Dr. Stinson addressed the issue of choice, by saying appellant always had a choice. He stated the negative experiences inflicted upon appellant were not his choice and these experiences impaired his ability to make choices. He cites to a risk and protective factors model published by the Surgeon General for the proposition that the presence of certain risk factors (including parent criminality, violent neighborhoods, psychological conditions, child maltreatment) have a "devastating impact" on normal development and increase the likelihood that a child or adolescent will engage in violent behaviors. He believes there should have been a greater emphasis on the potential damage to appellant's normal development. We do not find Dr. Stinson's trial testimony regarding appellant's choice differs significantly from that proposed by Dr. Minagawa. As discussed by the Ohio Supreme Court, Dr. Stinson "analyzed Belton's life through the lens of a [DOJ] model that identifies various risk factors that make a person more likely to engage in criminal behavior, as well as various protective factors that reduce the risk of such behavior." *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 178. While he conceded that appellant made a choice when he committed the crimes, Dr. Stinson's testimony explained that appellant's negative experiences shaped those choices and he "opined that [appellant's] background may reduce his moral culpability for his crimes." *Id*. at ¶ 179.

{¶ 102} Dr. Minagawa also argues that appellant's "course of development was further derailed by the presence and influence of numerous family members with criminal

49.

histories." There was evidence at trial presented regarding serious crimes committed by appellant's extended family and Dr. Stinson testified regarding "the family history of criminal behavior and substance abuse." Transcript, p. 824.

{¶ 103} Therefore, we do not find that Dr. Minawaga's affidavit has raised any issues different in strength or subject matter from that presented at trial so as to create a substantial issue that could affect the outcome of the trial.

*Dr. Giordano*

{¶ 104} Dr. Giordano discussed the various risk factors which impacted appellant, including maternal drug use, maternal criminality and incarceration, numerous residential moves, housing instability, family dysfunction (such as drug use, crime, violence, abuse, antisocial behavior) throughout his extended family, neighborhood and school environment, witnessing domestic violence, suffering neglect, his lack of a relationship with his father and his position as oldest child. She also pointed out that appellant's lack of a significant prior criminal history should be considered in mitigation.

{¶ 105} Appellant relied on this affidavit to argue that trial counsel were ineffective for failing to present the testimony of a forensic sociologist.

{¶ 106} However, we find Dr. Giordano's report does not include anything significant that was not presented to the trial court, and is a variation of Dr. Stinson's trial testimony.

50.

**Failure to Investigate, Prepare, and Present the Testimony of Lay Witnesses**

{¶ 107} Appellant also argues trial counsel failed to "investigate, prepare, and present the testimony of mitigation witnesses who were available and would have testified at trial concerning facts and circumstances of [appellant]'s background, family history, upbringing, mental health, and/or education." Upon review, we do not find the lay witness affidavits presented in support of appellant's postconviction petition offer evidence substantially different in strength and subject matter from that presented in the mitigation hearing. Although these affidavits go into more depth on certain subjects and provide new accounts, these exhibits do not discuss any new subject matter or avenue of mitigation. [11]

{¶ 108} Appellant has argued these witnesses "all had important pieces to add to * * * [the] mitigation case," and that some "addressed the family dysfunction and criminal history, some addressed [appellant's] educational challenges, some addressed his mental illnesses, some addressed the trauma he sustained by the family breakup, some addressed the failures of his parents, some addressed his youth and susceptibility to peer pressure, [and] some addressed his demeanor at trial." With the exception of his demeanor at trial, there was evidence presented at trial on these issues.

---

[11] We additionally note that some of the testimony presented in the lay affidavits is hearsay which cannot be considered in mitigation. *See State v. Grate*, 164 Ohio St.3d 9, 2020-Ohio-5584, 172 N.E.3d 8, ¶ 158 ("[T]he Rules of Evidence, including the hearsay rules, still apply to mitigation-phase hearings.").

51.

{¶ 109} Appellant also relies upon this evidence to differentiate himself from his brothers and explain what "led them down a different path than [him]." However, there was evidence presented at trial regarding how appellant's life differed from his brothers, and Dr. Stinson testified regarding the differences, and why it is inappropriate to compare one sibling to the other.

{¶ 110} With respect to appellant's demeanor at trial, there is no evidence that this affected the court's judgment, and it certainly did not affect the Ohio Supreme Court, who did not witness it, and who, upon independently weighing the evidence, found the aggravating circumstances outweighed the mitigating factors. Appellant also relies upon these factual affidavits to present evidence that he exhibited symptoms of ADHD. For the reasons discussed above, we do not find this evidence was sufficiently different from evidence presented at trial.

{¶ 111} We also note that, in his affidavit, appellant takes issue with the fact he was not put on the stand to give an unsworn statement. He states that had he been put on the stand he would have expressed remorse, and he would have provided additional information about his father. With respect to remorse, there was evidence of remorse in the record. As the Ohio Supreme Court acknowledged, Dr. Stinson and Linda Berry both testified that he had expressed remorse to them. *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 192. Additionally, there was much evidence presented regarding his relationship with his father.

## Conclusion regarding Ineffective Assistance of Counsel

{¶ 112} As appellant's petition was denied without a hearing, we must determine if the petition is sufficient on its face to raise an issue as to whether he was denied effective assistance of counsel. *See Bunch*, Slip Opinion No. 2022-Ohio-4723, at ¶ 27. We have considered the entirety of the trial court record as well as the new evidence filed by appellant in support of his postconviction petition. [12] For the reasons discussed above, we do not believe that appellant's petition is sufficient on its face to raise the issue that he was prejudiced by the alleged deficiencies.

## Constitutionality of Postconviction Procedures

{¶ 113} In his fifth assignment of error, appellant asserts his "convictions and death sentence are void or voidable because Ohio's postconviction procedures do not provide an adequate corrective process, in violation of the [U.S. and Ohio] constitution[s]." He submits, inter alia, the application of res judicata and the failure to hold evidentiary hearings and provide discovery resulted in a denial of any meaningful review.

{¶ 114} We have previously rejected the argument that "R.C. 2953.21 fails to afford [an appellant] an adequate collateral attack on his conviction and, therefore, violates his constitutional rights under the United States Constitution and the Constitution of the State of Ohio," and found Ohio's postconviction procedures constitutional. *State v.*

---

[12]  For purposes of appellant's petition, we have assumed the new evidence to be truthful.

*Zich*, 6th Dist. Lucas No. L-15-1263, 2017-Ohio-414, ¶ 29. *Also see State v. Maxwell,* 8th Dist. Cuyahoga No. 107758, 2020-Ohio-3027, ¶ 108. We agree that Ohio's postconviction procedures are constitutional and further find that the trial court did not err in denying appellant's application without a hearing.

{¶ 115} Thus, we find appellant's second and fifth assignments of error not well-taken.

### Third Assignment of Error

{¶ 116} Appellant argues the trial court erred in denying his petition for postconviction relief without permitting him to first conduct discovery. He requested leave to conduct depositions of: his trial counsel; each judge who served on his three-judge panel; Dr. Connell; and all employees of the Lucas County prosecutor's office who worked on his case and "all members of the panel that determine whether a case should be indicted with death specifications."

{¶ 117} He also sought all files and documents in the possession of the prosecutor's office and the Toledo Police Department or Lucas County Sheriff's Office relating to his prosecution as well as subpoenas duces tecum for any of Dr. Connell's files regarding his testimony in appellant's case and "any and all materials, protocols, training manuals, or guidelines, maintained in any form, that sets out the policy for Lucas County Prosecutors in seeking the [d]eath [p]enalty."

{¶ 118} Appellant also requested leave to conduct discovery in his postconviction petition.

54.

**{¶ 119}** Appellant maintains that discovery was required by both the Eighth and Fourteenth Amendments to the United States Constitution.

**{¶ 120}** A review of the record shows the trial court did not specifically address appellant's motion for discovery. Therefore, the motion is considered denied. *Treasurer of Lucas County v. Sheehan*, 6th Dist. Lucas No. L-18-1176, 2020-Ohio-3493, ¶ 12.

**Law**

**{¶ 121}** Prior to April 6, 2017, a postconviction petitioner was not entitled to discovery. It was held that postconviction review is not a constitutional right, but rather a collateral civil attack on a judgment governed by the postconviction relief statutes. *State v. Jordan*, 6th Dist. Lucas No. L-02-1130, 2003-Ohio-5194, ¶ 29. A petitioner only had those rights granted by the statute, which did not include discovery. *Id*. While a court could allow discovery, "the decision to grant or deny a request for discovery rest[ed] with a trial court's sound discretion." *State v. Broom*, 146 Ohio St.3d 60, 2016-Ohio-1028, 51 N.E.3d 620, ¶ 28. As the statute applied equally to all petitioners, we previously found the absence of the ability to conduct discovery did not result in a denial of either due process or equal protection. *Jordan* at ¶ 30. At least one court has also declined to recognize a postconviction right to discovery under the Eighth Amendment. *State v. Conway*, 10th Dist. Franklin No. 17AP-504, 2019-Ohio-2260, ¶ 36.

**{¶ 122}** We note that, effective April 6, 2017, R.C. 2953.21(A)(1)(d) permits discovery in death penalty cases when good cause is shown. Appellant has not argued that he is entitled to discovery under this provision, however, by its terms it applies "in

55.

conjunction with the filing of a petition for postconviction relief under [R.C. 2953.21(A)] by a person who has been sentenced to death, or *with the litigation of a petition so filed*." (Emphasis added.) Regardless, we find that appellant has not shown good cause for his discovery requests and the trial court did not abuse its discretion in denying appellant's requests for discovery. We further observe that appellant's petition for postconviction relief was supported by 26 exhibits comprised of over 900 pages of evidence. Hence, it does not appear that appellant's petition was hindered by a lack of discovery. *See e.g., Maxwell*, 8th Dist. Cuyahoga No. 107758, 2020-Ohio-3027, at ¶ 7; *State v. Sowell*, 8th Dist. Cuyahoga No.108018, 2020-Ohio-2938, ¶ 121.

{¶ 123} We therefore find appellant's third assignment of error not well-taken.

### Fourth Assignment of Error

{¶ 124} Appellant filed two motions seeking funds for experts. One motion requests a neuropsychologist to perform testing to determine if appellant had ADHD, and the second requests an expert in forensic psychiatry to evaluate appellant "for issues regarding his Bipolar Disorder." As with the motion for discovery, these motions were not specifically addressed by the trial court and therefore are considered denied. *Treasurer of Lucas County* at ¶ 12.

{¶ 125} Appellant first asserts that the trial court did not comply with its obligations under Crim.R. 42(E), which requires that all decisions pertaining to the appointment of experts be made on the record, and that the trial court "make written findings as to the basis of any denial." While we agree that the trial court did not make

56.

written findings explaining the basis of its denial of these motions, we find appellant has not demonstrated he was prejudiced as the record before us is sufficient for us to fully consider whether the court erred in denying appellant's motions. *See State v. McDonald*, 6th Dist. Lucas No. L-08-1181, 2010-Ohio-183, ¶ 20.

{¶ 126} Next, appellant contends that the trial court erred in denying these motions. "Under Crim.R. 42(E), the trial court has the discretion to appoint experts for indigent defendants in postconviction reviews of capital cases." *State v. Powell*, 2019-Ohio-4286, 148 N.E.3d 51, ¶ 48 (6th Dist.). We review a trial court's order denying a request to appoint experts for indigent defendants in postconviction reviews of capital cases for abuse of discretion. *Id.*

{¶ 127} Here, we do not find the trial court abused its discretion. Appellant had access to experts in support of his petition for postconviction relief. Therefore, it is not clear that he was prejudiced by any failure to get funding for additional experts. Moreover, appellant's bipolar disorder and possible ADHD were discussed at trial. Therefore, we cannot conclude that any additional funding would have resulted in any new evidence different in strength or subject matter from that already presented in mitigation. *See Sowell* at ¶ 123 ("Given the cumulative nature of the requested testing, we are unable to conclude that the trial court abused its discretion by failing to grant Sowell's request for additional funding.").

{¶ 128} We also note that appellant cites to Appt.Coun.R. 5.10(A), which states that "a court shall provide attorneys appointed as counsel for indigent defendants in

57.

capital cases * * * with * * * mental health professional[s] * * * reasonably necessary or appropriate for the attorneys to prepare for and present an adequate defense at every stage of the proceedings[, including] * * * disposition following conviction, and preparation for and presentation of mitigating evidence in the sentencing phase of the trial." To the extent this applies, as we discussed above, we do not find the requested experts were necessary and we further find that appellant had access to experts on postconviction.

{¶ 129} Accordingly, we find appellant's fourth assignment of error not well-taken.

## Sixth Assignment of Error

{¶ 130} Appellant argues that the trial court abused its discretion when it denied his nineteenth claim for relief, in which he argued that his death sentence was disproportionate to other similarly situated capital defendants in Lucas County.[13]

{¶ 131} As we discussed above, appellant's nineteenth claim for relief is barred by the doctrine of res judicata. In its consideration of appellant's direct appeal, the Ohio Supreme Court found that "[t]he death penalty is appropriate and proportionate in this case, when compared to death sentences approved in similar cases." *Belton*, 149 Ohio St.3d 165, 2016-Ohio-1581, 74 N.E.3d 319, at ¶ 196.

{¶ 132} On appeal, appellant also argues that R.C. 2929.021 and R.C. 2929.05 are unconstitutional on their face and as applied to appellant as they do not provide

---

[13] We note that appellant has not objected to the court's denial of his twentieth claim for relief, which similarly argued that his sentence was disproportionate to similarly situated defendants. We have therefore not discussed this claim for relief.

58.

meaningful proportionality review. He maintains that there are "substantial doubts as to the adequacy of the information received after guilty pleas to lesser offenses or after charge reductions at trial"; that the statutes' "failure to require the jury or three-judge panel recommending life imprisonment to identify the mitigating factors undercuts adequate appellate review"; the comparison method is flawed as "[t]here is no meaningful way to distinguish capital defendants who deserve the death penalty from those who do not"; and the Ohio Supreme Court's appropriateness review is constitutionally infirm as it "is very cursory." Such constitutional challenges have consistently been rejected. *See e.g., Smith v. Mitchell*, 567 F.3d 246, 261 (6th Cir.2009); *Stojetz v. Ishee*, S.D.Ohio No. 2:04-CV-263, 2014 WL 4775209, *105 (Sept. 24, 2014). We similarly do not find that R.C. 2929.021 and R.C. 2929.05 are unconstitutional on their face, nor do we find that they are unconstitutional as applied to appellant.

{¶ 133} We therefore find appellant's sixth assignment of error not well-taken.

### Seventh Assignment of Error

{¶ 134} In both his twenty-second and twenty-fifth claims for relief, appellant asserted that if the individual claims for relief did not warrant the granting of relief, the cumulative impact of those errors prejudiced him and required he be granted relief. In support he cites to *State v. DeMarco,* 31 Ohio St.3d 191, 509 N.E.2d 1256 (1987).

{¶ 135} The Ohio Supreme Court has stated that before a court may find a defendant was prejudiced by "cumulative error," it must first conclude that multiple errors were committed. *Blanton*, Slip Opinion No. 2022-Ohio-3985, at ¶ 80. As

59.

appellant has not established any constitutional violations, he cannot establish cumulative error.

{¶ 136} Accordingly, appellant's seventh assignment of error is found not well-taken.

### Conclusion

{¶ 137} The judgment of the Lucas County Common Pleas Court is affirmed. Pursuant to App.R. 24, appellant is hereby ordered to pay the costs incurred on appeal.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.

Mark L. Pietrykowski, J. _____
                                JUDGE
Thomas J. Osowik, J.

Myron C. Duhart, P.J.                              JUDGE
CONCUR.

_____
                                JUDGE

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.supremecourt.ohio.gov/ROD/docs/.